UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT LEDERMAN and JACK
NESBITT,

          Plaintiffs,

    -v-

NEW YORK CITY DEPARTMENT OF
PARKS AND RECREATION, ADRIAN
BENEPE, CITY OF NEW YORK, and
MICHAEL BLOOMBERG,

          Defendants.

No. 10 Civ. 4800 (RJS)
MEMORANDUM & ORDER

---

DIANE I. DUA, *et al.*,

          Plaintiffs,

    -v-

NEW YORK CITY DEPARTMENT OF
PARKS AND RECREATION, ADRIAN
BENEPE, CITY OF NEW YORK, and
MICHAEL BLOOMBERG,

          Defendants.

No. 10 Civ. 5185 (RJS)
MEMORANDUM & ORDER

---

<u>RICHARD J. SULLIVAN</u>, District Judge:

      In these two related cases, Plaintiffs are artists who make their living by selling their works

on sidewalks and in public parks in New York City. They challenge the constitutionality of recently

enacted revisions to the Rules of the City of New York governing where sellers of art and books —

also known as "expressive-matter vendors" — may sell their wares. *See* 56 R.C.N.Y. §§ 1-02, 1-05

(the "Revisions"). Specifically, the Revisions state that in Battery Park, Union Square Park, the

High Line, and certain parts of Central Park, expressive-matter vendors who wish to set up a display

stand to sell their wares may do so only in a limited number of designated spots, which are allocated

on a first-come, first-served basis.  Plaintiffs contend that these revisions violate their First and Fourteenth Amendment rights.

Before the Court are Plaintiffs' motions for a preliminary injunction preventing these revisions from taking effect on July 19, 2010.  Because the revisions appear to be reasonable, content-neutral time, place, and manner restrictions that are narrowly tailored to advance a significant government interest, while leaving open ample alternative channels for expressive activity, and because Plaintiffs' Equal Protection claims do not trigger heightened scrutiny, the Court concludes that Plaintiffs are not likely to succeed on the merits of their underlying claims for declaratory and injunctive relief.  Accordingly, the motions for a preliminary injunction are denied.

## I. BACKGROUND

### A. Previous Attempts To Regulate Expressive-Matter Vendors

This case is the most recent episode in a long line of legal disputes between art vendors and the City.  In 1994, Plaintiff Robert Lederman and other artists brought a constitutional challenge to provisions of the City's General Vendors Law.  *See Bery v. City of N.Y.*, 97 F.3d 689 (2d Cir. 1996). Under the law as it stood at the time, all vendors (other than book sellers) were required to obtain a general vendors licence before selling their wares in any public space.  *Id.* at 692.  Only 853 general vendors licenses were in existence, and licenses only became available when current license holders failed to renew.[1]  *Id.*  The waiting list to acquire a license had between 500 and 5,000 names on it, and, with the exception of one year in which 300 new licenses had been issued as the result of a bookkeeping error, no new licenses had been issued in the previous fifteen years.  *Id.* at 693,

---

[1] The one exception to this limit was that any veteran who qualified for a general vendors license had to be issued one.  *Bery*, 97 F.3d at 692.

2

697 n.7.  Largely as a result of these limitations, there were no known examples of artists being licensed to sell their works on City property.  *Id.* at 697 n.7.  On this basis, the Second Circuit described the ordinance as "a *de facto* bar preventing visual artists from exhibiting and selling their art in public areas in New York."  *Id.* at 697.  Having held that selling art in public spaces is expressive activity protected by the First Amendment, the Court had no trouble concluding that the law was "too sweeping to pass constitutional muster."  *Id.* at 696-97.  Because it operated as a complete ban on protected activity anywhere on City property, it was not narrowly tailored to advance a significant government interest, nor did it allow ample alternative channels for expressive activity.  *See id.* at 697 ("The City may enforce narrowly designed restrictions as to where appellants may exhibit their works in order to keep the sidewalks free of congestion and to ensure free and safe public passage on the streets, but it cannot bar an entire category of expression to accomplish this accepted objective when more narrowly drawn regulations will suffice."); *id.* at 698 ("The sidewalks of the City must be available for appellants to reach their public audience.  The City has thus failed to meet the requirement of demonstrating alternative channels for appellants' expression.").  The Court also held that the "requirement that appellants' art cannot be sold or distributed in public areas without a general vendors license, while written material may be sold and distributed without a license," when combined with the First Amendment infringement, resulted in an Equal Protection violation.  *Id.* at 699.

In striking down the regulations, however, the *Bery* Court noted that "there exist less intrusive means" for accomplishing the City's objectives:  "one *amicus* [the ACLU] suggests a rotating first-come, first-served lottery system for assigning a limited number of licenses.  The system employed by San Francisco might provide a model:  certain areas are set aside for art sales

and a weekly lottery assigns spots." *Id.* at 698 n.8 (citation omitted).  Although the Court did not expressly bless such alternative systems as permissible, that was the clear import of its message.

Perhaps on this basis, the City amended its regulatory scheme to provide for "seventy-five site-specific permits for art vendors in Manhattan parks, including twenty-four sites in front of" the Metropolitan Museum of Art, a coveted spot for art vendors.  *See Lederman v. Giuiani*, No. 98 Civ. 2024 (LMM), 1998 WL 186753, at *1 (S.D.N.Y. Apr. 17, 1998) ("*Lederman I*").  Each permit gave "its holder a legal right to sell his work in a specific area for one month" at a cost of twenty-five dollars.  *Id.*  In the event that more than "seventy-five people appl[ied] for the seventy-five sites available in Manhattan, or if there [were] more applications than spaces available for any particular location, the Parks Department would hold a random-draw lottery for each month." *Id.* at 2.  Artists who were "willing to accept permits for other sites" could "rank their choices of location in order of preference.  If the artist's first choice [wa]s unavailable, the artist would be assigned to his second choice, if that site was available." *Id.*  If an artist could not "obtain a permit to sell his work in Manhattan, he [could] obtain a permit to sell his work in Prospect Park in Brooklyn, where there [was] no limit on the number of art vending permits." *Id.*

The plaintiffs in *Lederman I* chose not to obtain permits and were consequently ticketed, and their artworks were seized.  *Id.*  They then sought to preliminarily enjoin further enforcement on the grounds that the regulations violated the First and Fourteenth Amendments.  *See id.* at *3-4.  The Honorable Lawrence M. McKenna, District Judge, denied the motions for a preliminary injunction. *Id.* at *6.  In doing so, he held, first, that the regulations were content-neutral time, place, and manner restrictions.  *Id.* at *3.  He next held that "[t]he City undoubtedly has a significant interest in preserving and promoting the scenic beauty of its parks, providing sufficient areas for recreational

uses, and preventing congestion in park areas and on perimeter sidewalks." *Id.* He further held that the "regulations [were] narrowly tailored to serve the government's interest in preserving the essential character of the City's parks and keeping the parks and perimeter sidewalks safe and free of congestion." *Id.* He found that the number of allotted sites appeared to be reasonable and that "the lottery system . . . ensure[d] that the permits [would] be distributed fairly and that new artists, each month, [would] have an opportunity to sell their work in front of the Met." *Id* at *4. Finally, he concluded that the regulations left "open alternative avenues for communication" because "[a]n unlimited number of permits are available for Prospect Park in Brooklyn," and because "[a]ny artist vendor who is foreclosed from obtaining a permit or chooses not to obtain one may, under *Bery*, sell his artwork on any other public sidewalk throughout the City not within the jurisdiction of the Parks Department, subject only to narrow restrictions." *Id.*

After discovery concluded, the parties filed motions for summary judgment. At that point, Judge McKenna concluded — without disturbing his preliminary analysis of the regulations' constitutionality — that the regulations should be interpreted, as a matter of state administrative law, not to apply to expressive-matter vendors. *See Lederman v. Giuliani*, No. 98 Civ. 2024 (LMM), 2001 WL 902591, at *6 (S.D.N.Y. Aug. 7, 2001), *aff'd* 2003 WL 21664300 (2d Cir. July 15, 2003).[2]

B. The Revisions

Over the next eight and a half years, expressive-art vendors were generally free to sell their wares on sidewalks and in parks throughout the City, subject only to limited regulations that, for example, prohibit vendors from setting up displays on top of subway grates or leaning anything

---

[2] The state-law grounds for finding the restrictions inapplicable to expressive-matter vendors have evidently been obviated, since Plaintiffs do not suggest here that the Revisions are vulnerable on the same grounds.

against trees or park benches.  *See* 56 R.C.N.Y. § 1-05(b)(4).  Over the course of this period, the

number of expressive-matter vendors in Central Park, Battery Park, and Union Square Park "more

than tripled," according to Jack Linn, an Assistant Commissioner and Senior Counselor of the Parks

Department.  (Linn Decl. ¶ 6.)[3]  "This dramatic increase in the number of vendors . . . resulted in

congested conditions in and around these parks, especially for those seeking to enter a park, as well

[as] crowding out other park users."  (*Id.*)

On March 24, 2010, the Parks Department published proposed changes to the Rules of the

City of New York.  On April 23, 2010, the Parks Department held a public hearing to discuss the

proposed changes.  (*Id.* ¶ 4 n.4.)  Based on the comments at the hearing and more than 200 written

submissions, the Department revised the rules and published the new version on June 18, 2010.  (*Id.*)

Under this final version of the Revisions, which will take effect on July 19, 2010,

> [p]ersons may vend expressive matter, as defined in section 1-02 of this title,[4] on
> property under jurisdiction of the Department without a permit, but must comply
> with all applicable provisions of these rules.  However, in the specific locations
> enumerated in paragraph (3) expressive matter vendors may only vend expressive
> matter at the specifically designated spots identified by the Commissioner in the
> accompanying maps and as marked by a Department decal, medallion, or other form
> of marking, on the specific location of the approved vending spot, unless they are
> only vending expressive matter without using a cart, display stand or other device
> and without occupying a specific location for longer than necessary to conduct a
> transaction and are otherwise in compliance with Department rules.

---

[3] According to Mr. Linn, "[w]hile the recently opened High Line park has not yet been overwhelmed by expressive matter vendors, given its popularity, its unique configuration, its narrow pathways and delicate plantings it is appropriate to establish limitations for this park as well."  (Linn Decl. ¶ 12 n.8.)

[4] Section 1-02 defines "expressive matter" to mean "materials or objects with expressive content, such as newspapers, books, or writings, or visual art such as paintings, prints, photography, or sculpture."  56 R.C.N.Y. § 1-02.  Plaintiffs have not suggested that there is any constitutional problem with this definition.

These spots shall be allocated upon a first come, first serve basis except as otherwise provided by law and any expressive matter vendor may only vend expressive matter centered directly behind the Department decal, medallion, or other form of marking and if multiple expressive matter vendors attempt to vend expressive matter at any one Department decal, medallion, or other form of marking and if it cannot be otherwise determined which expressive matter vendor arrived first, then all such expressive matter vendors at such spot will be in violation of this section and may be directed to leave the area of that Department decal, medallion or other form of marking immediately. . . .

Expressive matter vendors can only occupy the designated spots for the purpose of vending expressive matter and only during posted times, which will be consistent with the hours of operation for the park where such designated spots are located in or adjacent to.

56 R.C.N.Y. § 1-05(b)(2) (paragraph breaks added).

Section 1-5(b)(3) further provides that

[e]xpressive matter vendors may not vend in the following general areas unless they vend at the specifically designated spots for such vending on the accompanying maps and in compliance with all other applicable Department rules:

(i) Central Park at the following locations: (A) the perimeter of the park between East 85th Street and East 60th Street, including all sidewalks and plazas[,] (B) the perimeter of the park between West 86th Street and West 60th Street, including all sidewalks and plazas[,] (C) all of Central Park South, including all sidewalks and plazas[,] (D) Wien Walk and Wallach Walk, (E) pedestrian pathways parallel to East Drive between Grand Army Plaza and the Center Drive, (F) Grand Army Plaza, (G) Pulitzer Plaza, and (H) Columbus Circle.

(ii) Battery Park, including all perimeter sidewalks.

(iii) Union Square Park, including all perimeter sidewalks.

(iv) Elevated portions of High Line Park.

56 R.C.N.Y. §1-05(b)(3) (paragraph breaks added).

"[T]he accompanying maps" referenced in § 1-05(b)(3) set forth sixty-eight spots for expressive-matter vendors in the designated portions of Central Park (including twenty-eight outside of the Met); nine spots for expressive-matter vendors in Battery Park; eighteen spots for expressive

matter vendors in Union Square Park, plus forty more on Tuesdays, Thursdays, and Sundays (when the Greenmarket[5] is closed); and five spots along the High Line.  (Linn Decl. Exs. A-D.)

## C. Procedural History

The *Lederman* Plaintiffs' case was filed on June 18, 2010 (the same day that the Revisions were published) and was referred to Judge McKenna as possibly related to *Lederman v. Giuliani*, No. 98 Civ. 2024.  When the referral was declined, Plaintiffs presented an application for an Order To Show Cause and a Temporary Restraining Order to the Part One judge, who declined to sign the order.  The case was then reassigned to my docket.

On June 24, 2010, the Court issued an Order denying Plaintiffs' application for an ex parte TRO, but ordering Defendants to show cause on July 8, 2010 as to why a preliminary injunction should not issue.  On July 7, 2010, the *Dua* Plaintiffs filed their case, which the Court accepted as related.  As it had done before, the Court denied the request for ex parte relief, but ordered Defendants to show cause as to why a preliminary injunction should not issue.  On July 8, 2010, the Court held a preliminary-injunction hearing for both cases.  At that hearing, the parties agreed that an evidentiary hearing was unnecessary to resolve the instant motions, which were fully submitted on July 13, 2010.

## II. PRELIMINARY INJUNCTION STANDARD

"In most cases, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in the movant's favor."  *Jolly*

---

[5] The Greenmarket is an open-air farmers' market, where vendors have sold produce since 1976.

*v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (internal quotation marks omitted).  Where, as here, "a moving party challenges government action taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party cannot resort to the fair ground for litigation standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Id.* (internal quotation marks omitted).[6]  Because the injunctive relief sought is prohibitory rather than mandatory in nature — that is, because the relief seeks to preserve rather than alter the status quo — Plaintiffs need not further establish that their likelihood of success on the merits is "clear" or "substantial." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 89 (2d Cir. 2006).

The City does not dispute that Plaintiffs have satisfied the first prong of the preliminary injunction test, since the Second Circuit has held both that selling expressive matter is entitled to First Amendment protection and that allegations of First Amendment infringement constitute irreparable harm.  *See Bery*, 97 F.3d at 693.  The inquiry therefore turns on whether Plaintiffs have established a likelihood of success on the merits.  It bears noting that "[a]lthough the ultimate burden of proof rests with the City" on the underlying constitutional challenge, "the plaintiffs must show a likelihood of success on the merits in order to secure a preliminary injunction." *Terminello v. City of Passaic*, 118 F. App'x 577, 579 (3d Cir. 2004).  As such, the fact that Defendants have not yet developed the record sufficiently to rebut all possible assertions of pretext will not be enough to warrant a preliminary injunction.

---

[6] The *Lederman* Plaintiffs contend that the challenged regulations do not constitute "government action taken in the public interest" because the reasons underlying the regulations are merely pretextual.  According to the *Lederman* Plaintiffs, the regulations were in fact enacted for the purposes of punishing independent artists generally and retaliating against Robert Lederman specifically.  Plaintiffs cite no authority for this proposition.  But, at any rate, the Court concludes that nothing in the record as it currently stands would support such a finding of pretext, as explained in more detail below.

III. DISCUSSION

A. First Amendment Claims

The threshold issue in deciding Plaintiffs' First Amendment claims is whether the Revisions, which regulate the time, place, and manner of expressive-matter vendors' activities, are content neutral. Courts "apply 'intermediate scrutiny' to regulations of expressive activity that are not based on content. Content-neutral regulations may limit the time, place, or manner of expression — whether oral, written, or symbolized by conduct — even in a public forum, so long as the restrictions are reasonable, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication of the information." *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 98 (2d Cir. 2006) (internal quotation marks omitted). By contrast, if regulations are content based, they are subject to strict scrutiny and are presumptively invalid. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

1. Content Neutrality

Plaintiffs' primary contention is that the Revisions are content based because they treat expressive-matter vendors differently from other vendors. *See Bery*, 97 F.3d at 697 (citing *Buckley v. Valeo*, 424 U.S. 1, 18 (1976), for the proposition that "only regulations which do not discriminate among speakers or ideas are content-neutral"). As the Supreme Court has explained, however, "it is mistaken" to interpret *Buckley* to mean that "all regulations distinguishing between speakers warrant strict scrutiny." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 657 (1994). Rather, *Buckley* "stands for the proposition that speaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Id.* at 658; *see also BellSouth Corp. v. F.C.C.*, 144

F.3d 58, 69 (D.C. Cir. 1998) (explaining that it is not "the act of 'singling out' by itself, that triggers strict First Amendment scrutiny," but rather the suspicion that speaker-based laws are the means for suppressing certain ideas). Indeed, "heightened scrutiny is unwarranted when the differential treatment [between speakers] is justified by some special characteristic of the particular [speaker] being regulated." *Turner*, 512 U.S. at 660-61.

Thus, while the existence of a speaker-based regulation might provide a basis for inferring government disapproval of the speaker's message, the Revisions should not be subject to strict scrutiny simply because they apply only to expressive-matter vendors. Instead, the Court should apply the general test for determining content neutrality. As the Supreme Court has explained,

> [t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citations omitted).

As an initial matter, it is clear that the Revisions are completely unrelated to the content of the expressive matter being sold. This is not a case in which, for example, books and paintings that express certain messages or ideas are treated differently from books and paintings that express other, less-favored messages or ideas.[7] Nor is it a case in which the spots at which expressive-matter vendors can sell is determined by the content of the items they are selling. So long as a vendor is selling expressive matter, these rules apply, regardless of the content of the expression.

---

[7] The case is thus readily distinguishable from *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), on which Plaintiffs heavily rely, because that case involved the banning of some newsracks, but not others, purely on the basis of the content of the materials the newsracks contained. *See id.* at 424.

A question remains, however, about whether the Revisions reflect government disapproval of the protected activity of *selling* expressive matter.  In other words, while the Revisions are completely agnostic with regard to the content of the art and books being sold, they arguably reflect government disapproval of the act of artists and writers selling their works in public spaces.

In support of this conclusion, Plaintiffs emphasize that the Revisions apply only to expressive-matter vendors, not to other types of vendors.  The first thing to note in response is that while these particular Revisions only regulate expressive-matter vendors, they are part of a more comprehensive regulatory scheme that governs the time, place, and manner for all vendors' sales.  A glance at the vendors' map for Central Park, for example, shows designated spots for food vendors and souvenir vendors alongside expressive-matter vendors — with the latter appearing to significantly outnumber either of the former groups.  (*See* Linn Decl. Ex. A.)  Furthermore, the only reason that expressive-matter vendors are governed by their own set of regulations is that courts — at the urging of some of the very plaintiffs named here — have struck down previous attempts to treat expressive-matter vendors just like all other vendors.  *See Bery* at 698-99.

Moreover, to the extent that the regulatory scheme, taken as a whole, treats vendors of expressive matter differently from vendors of other wares, it is only because expressive-matter vendors are treated more favorably than other vendors.  Expressive-matter vendors can sell their wares without a general vendors license, and they can sell in any public space in the City — other than the four areas specified in the Revisions — subject only to the generally permissive time, place, and manner restrictions of the General Vendors Laws.  Expressive-matter vendors, unlike souvenir vendors, are free to sell at other locations throughout the parks so long as they do not use carts or stop in one spot for longer than necessary to complete a transaction.  And if expressive-matter

vendors would prefer not to be bound by the restrictions set forth in the Revisions, they are always free to obtain a general vendors license. The fact that they are not *required* to do so does not mean that they are not *allowed* to. Taken together, it is difficult to credit Plaintiffs' argument that expressive-matter vendors are treated worse than other types of vendors.

Plaintiffs next emphasize that other people engaged in expressive activity — such as street performers or artists who merely want to display, but not sell, their work — are not governed by the Revisions.[8] As noted, however, the key inquiry is whether the regulation treats speakers differently on the basis of the content of their expressive activity. Where "differential treatment is justified by some special characteristic of the regulated group," rather than by reference to the content of their expression, "heightened scrutiny is unwarranted." *Turner*, 512 U.S. at 660-61. Although the record is not entirely developed on this point, it appears likely that the City will be able to establish that expressive-matter vendors are treated differently from non-soliciting performers and other such park users because only expressive-matter vendors contribute in any appreciable way to congestion on the sidewalks and in the parks. That it is congestion rather than content underlying this differential treatment is likewise supported by the fact that the Revisions permit expressive-matter vendors who do not use "a cart, display stand or other device" to sell their wares throughout the parks so long as they do not stop in one place for any longer than necessary to complete a transaction. Thus, expressive-matter vendors who do not take up much space or occupy any one location for long are free to sell wherever they want, subject only to minimal restrictions. This suggests that the Revisions are not an attempt to stifle the selling of expressive matter.

_____

[8] It should be noted that only street performers who do not solicit donations are exempted in this way. Performers who do solicit donations are required to first obtain general vendors license. *See* 56 R.C.N.Y. § 1-04(s).

As a result, the fact of differential treatment in this context does not "raise[] suspicions that [the Revisions'] objective was, in fact, the suppression of certain ideas." *Turner*, 512 U.S. at 660. And because the Revisions "serve[] purposes unrelated to the content of expression," they should be "deemed neutral, even" though they may have an "incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791; *see also Mastrovincenzo*, 435 F.3d at 99 ("New York City's licensing requirement is clearly a content-neutral speech restriction because it serves purposes unrelated to the content of the regulated expression, namely . . . keeping the public streets free of congestion for the convenience and safety of its citizens.").

Because the Court concludes that the Revisions appear to be content-neutral time, place, and manner restrictions, it will apply intermediate scrutiny to consider whether they are narrowly tailored to advance a significant government interest while leaving open ample alternative channels for communication. In the course of doing so, the Court will consider Plaintiffs' allegations of pretext, which suffuse their papers and relate to multiple components of the analysis.

### 2. Significant Government Interest

The "Statement of Basis and Purpose" accompanying the Revisions provides as follows:

> These rules address concerns raised by park visitors, vendors, and other members of the public, as well as Department staff, related to the proliferation, in certain parks, of expressive matter vendors and the impact they can have on parkland and other park visitors. In fact, in the absence of Department rules regarding expressive matter vendors, the number of these vendors combined for Battery Park, Central Park, and Union Square Park has almost tripled since 2001, when the Department ended its old lottery system for vendor permits in these parks pursuant to the New York City Administrative Code. This dramatic increase in the number of vendors changed conditions in certain parks and required the Department to develop regulations to balance use by expressive matter vendors and other park visitors, and address other concerns related to maintaining and operating open space under the jurisdiction of the Department.

> Therefore, to accommodate the interest of a broad range of park visitors,

14

including the interests of expressive matter vendors who wish to operate on parkland, the rules establish general park locations where vendors may operate and minimum requirements regarding vending activity, such as the set-up and size of display stands.   These rules follow many of the provisions of the New York City Administrative Code that regulate vendors who operate on the City's streets, but have been adapted to address the nature of property under the Department's jurisdiction.

The rules also include additional regulations in and around the three parks most impacted by expressive matter vendors (certain designated areas of Central Park, Union Square Park and Battery Park), and the park most likely to be significantly affected by expressive matter vendors due to its unique use and character (High Line Park).   Specifically, the Department has identified locations within these areas where expressive matter vendors can operate, giving consideration to areas where such vendors have previously been operating.   In these locations, the general rules concerning vending, established by this amendment, are not sufficient to properly regulate expressive matter vending so as to avoid such areas from being overwhelmed by vendors in a manner that significantly interferes with the experience and comfort of the public visiting the parkland in question, or, in some cases such general rules may unduly limit expressive matter vending in an area where it can be accommodated without interfering with other park uses.

(Magsino Decl. Ex. D.)

Defendants expand on these points in their opposition papers, noting that "[w]hile the focus during the July 8, 2010 oral argument was on the City's stated interest in reducing congestion, . . . the spot designations are also designed to address aesthetic concerns — specifically, to preserve the integrity of the overall design of the parks, including the need to preserve landscapes and scenic views, and to ensure that the parks are available to the public for a wide range of activities, including active and passive recreation, performances, demonstrations and the viewing of historical monuments and public art exhibits."  (Defs.' Opp'n 3.)  These stated purposes plainly implicate significant government interests.  *See Bery*, 97 F.3d at 697 ("The City certainly has a significant interest in keeping its public spaces safe and free of congestion."); *Lederman I*, 1998 WL 186753, at *3 ("The City undoubtedly has a significant interest in preserving and promoting the scenic

beauty of its parks, providing sufficient areas for recreational uses, and preventing congestion in park areas and on perimeter sidewalks."); *see also Ward*, 491 U.S. at 797 ("The city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer . . . ."); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 296 (1984) (noting the "Government's substantial interest in maintaining the parks . . . in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence.")

       Plaintiffs do not argue otherwise. Rather, they contend that the stated reasons behind the Revisions are merely pretextual, and that Defendants actually promulgated these rules either to drive independent artists out of the four designated parks, or (according to the *Lederman* Plaintiffs) to retaliate against Robert Lederman personally — a conspiracy that allegedly includes both the Parks Commissioner and the Mayor. In support of their pretext arguments, Plaintiffs insist that the City's stated interest in preventing congestion cannot be sincere, in light of the fact that it allows other activities that contribute more significantly to congestion and pose greater threats to public safety, such as the Union Square Greenmarket, the annual Christmas tree market, periodic public yoga classes on the High Line, and public art displays like Christo and Jean-Claude's "The Gates."

       These facts provide no basis to infer that the City is insincere in its stated purposes. That the City tolerates heightened congestion in some circumstances neither requires it to tolerate such congestion at all times nor suggests that its other congestion-reducing measures are pretextual. Furthermore, Plaintiffs' argument takes too narrow a view of the purposes underlying the Revisions. If it were true that they were only promulgated to address the sort of severe congestion that threatens public safety, then some skepticism might be in order, since the City has conceded that park

congestion, while worse than it was in 2001, has not yet reached that point. But the Revisions also serve to improve aesthetics, prevent interference "with the experience and comfort of the public visiting the parkland in question," and to allow for an array of activities, including quiet enjoyment. (*See* Magsino Decl. Ex. D.) At a later point in the proceedings, Defendants may be required to do more to establish, for example, that congestion caused by expressive-matter vendors actually got worse over time. But they have posited several perfectly legitimate significant interests, and Plaintiffs' attempts to undercut them through assertions of pretext have not established a likelihood of success on the merits.

### 3. Narrow Tailoring

To be narrowly tailored, a regulation need not be the least restrictive or least intrusive means for advancing the government interest at issue. *Hill v. Colorado*, 530 U.S. 703, 726 n.32 (2000). Rather,

> the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

*Ward*, 491 U.S. at 798-801 (internal quotation marks, citations, and alterations omitted).

Throughout their papers, Plaintiffs insist that the Revisions are the equivalent of a complete ban on expressive-matter vending, no different from the rules at issue in *Bery*. This suggestion is baseless. At the time that *Bery* was decided, there was not a single artist who was legally permitted to sell art anywhere on public property. By contrast, under the Revisions, artists can sell on any

sidewalk and in every park in the City.  That four of the parks allow an aggregate of roughly one

hundred (rather than an unlimited number) of stationary expressive-matter vendors is nowhere close

to "a *de facto* bar preventing visual artists from exhibiting and selling their art in public areas in New

York."  *Id.* at 697.

To the contrary, the Revisions bear the hallmarks of a carefully considered attempt to

advance a significant government interest without placing undue burdens on expressive-matter

vendors.  The Linn Declaration, for example, sets forth the decisionmaking process for each of the

regulated parks.  It reflects an attempt to accommodate the needs and wishes of expressive-matter

vendors while still addressing the goals of reducing congestion, improving aesthetics, and ensuring

multiple uses.  For example, in designating thirteen spots along Wien Walk (a path in Central Park

connecting Doris Freedman Plaza to the Central Park Zoo), the City created an exception to the

general restrictions of the General Vendors Law in order to accommodate more expressive-matter

vendors.  Likewise, the number of expressive-matter vendors in Union Square Park increases by

forty on days when the Greenmarket is not operating.  Although further development of the record

may eventually be necessary, the Revisions appear to be reasonable and narrowly tailored.  *See*

*Lederman I*, 1998 WL 186753, at *4 (finding that a more restrictive regulatory scheme than the one

currently at issue appeared to be narrowly tailored).  As such, Plaintiffs have not established a

likelihood of succeeding in their challenge to the Revisions' narrow tailoring.

### 4.  Ample Alternative Channels

For many of the reasons just set forth, the Court concludes that the Revisions leave ample

alternative channels for Plaintiffs' expressive activities.  The regulations cover only about fifty-two

acres of parkland, or approximately 0.18% of the parkland in the City and 1.9% of the parkland in

Manhattan.  (Linn Decl. ¶ 4.)[9]  Although Plaintiffs who miss out on a designated spot may find it less lucrative to take their wares to Prospect Park, Riverside Park, Tompkins Square Park, or any one of hundreds of others places in the City, it is difficult to see how the alternative channels are anything but ample.  *See Int'l Action Ctr. v. City of N.Y.*, 587 F.3d 521, 529 (2d Cir. 2009) (noting that alternative channels need not be "perfect substitutes" for the channels that are closed by regulations); *Mastrovincenzo*, 435 F.3d at 102 ("[T]he First Amendment does not require that New York City permit plaintiffs to sell their work directly to the public in an ideal venue . . . .").[10]

\* \* \*

As noted throughout, the Court does not dismiss the possibility that Plaintiffs may ultimately be able to succeed on their claims for declaratory and injunctive relief by, for example, adducing evidence that shows that the City's stated reasons are pretextual, or that "a substantial portion of the burden on speech does not serve to advance" the City's goals.  *Ward*, 491 U.S. at 799.  On this record, however, the Revisions appear to be reasonable, content-neutral restrictions on time, place, and manner that are narrowly tailored to advance a significant government interest while leaving

---

[9] Plaintiffs note that much of the parkland unaffected by the Revisions is unsuitable for their purposes.  This is almost certainly true.  The fact remains, however, that the Revisions affect only a minuscule portion of the channels available for expressive activity.

[10] Defendants point to an Internet publication called "Selling Art on the Streets of NYC:  The Legal Basics," apparently written by Plaintiff Robert Lederman, that states, "[A]lmost every street in NYC . . . is legally open to vending by artists, so there is more than enough space for us all.  You can sell 24 hours a day on most streets. . . .  Chelsea is now home to hundreds of art galleries and is an ideal place to encounter serious art collectors."  (Defs.' Opp'n 10 n.8 (quoting http://knol.google.com/k/selling-art-on-the-street-the-basics#).)  Although the Court does not treat this as an admission or otherwise give it any legal effect, particularly since its origin has not been established, the Court agrees that the quoted passage states the situation accurately.

open ample alternative channels for the expressive activity. As such, the Court cannot conclude that Plaintiffs are likely to succeed on the merits of their First Amendment claims.

## B. Equal Protection

"When a statute neither impinges on a fundamental right guaranteed by the Constitution nor uses a classification based on a suspect criterion such as race, nationality, alienage, or gender, the law generally will not be found to violate the Equal Protection Clause unless it has no reasonable or rational basis." *Story v. Green*, 978 F.2d 60, 63-64 (2d Cir. 1992). Here, Plaintiffs' argument for strict scrutiny rests entirely on the contention that the Revisions "impinge[] on" their First Amendment rights. For the reasons set forth above, however, it does not appear that Plaintiffs' First Amendment rights have actually been infringed. As a result, and because the Revisions do not classify on the basis of a suspect criterion, the Revisions should be subject to rational-basis review for equal protection purposes, and Plaintiffs have not established that they are likely to successfully carry the heavy burden of winning a rational-basis challenge. Rather, for the reasons set forth above, it appears likely that the City will be able to establish that the Revisions are "rationally related to a legitimate government interest." *See, e.g.*, *Kraham v. Lippman*, 478 F.3d 502, 506 (2d Cir. 2007).

## C. Other Claims

The *Lederman* Plaintiffs bring assorted other civil rights claims, most of which appear to be linked somehow to Lederman's recent arrest on the High Line. Although their argument is not entirely clear, it appears they are contending either (1) that Lederman's arrest was the result of a conspiracy to target and punish him, or (2) that the Revisions were promulgated as retribution for Lederman's past actions. The first argument would not provide a basis for enjoining the Revisions

20

from taking effect, and the second is merely a rehash of Plaintiffs' pretext arguments — which, as noted, appear at this point to be arguments on which Plaintiffs are unlikely to succeed.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs' motions for a preliminary injunction are denied. Accordingly, IT IS HEREBY ORDERED THAT, by August 5, 2010, the parties shall jointly submit to the Court a proposed case management plan and scheduling order. A template for the order is available at http://www1.nysd.uscourts.gov/judge_info.php?id=99. The proposed case management plan should be emailed to my chambers at the following email address: sullivannysdchambers@nysd.uscourts.gov. Please consult my Individual Rules with respect to communications with chambers and related matters.

SO ORDERED.

DATED:      July 16, 2010
            New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/16/10

21