UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────

No. 10 Civ. 4800 (RJS)

───────────────────

ROBERT LEDERMAN AND JACK NESBITT,

Plaintiffs,

VERSUS

NEW YORK CITY DEPARTMENT OF PARKS AND RECREATION, *et al.*,

Defendants.

───────────────────

MEMORANDUM AND ORDER
September 30, 2012

───────────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiffs Robert Lederman and Jack Nesbitt, visual artists who sell their work on sidewalks and in public parks in New York City (the "City"), bring this suit challenging the constitutionality of recent revisions to the Rules of the City of New York ("R.C.N.Y.") governing where "expressive matter vendors" – defined as sellers of books, art, and similar work – may sell their wares. *See* 56 R.C.N.Y. §§ 1-02, 1-05 (the "Revisions"). Specifically, the Revisions contemplate that in Battery Park, Union Square Park, the High Line, and certain parts of Central Park, expressive matter vendors may set up display stands and the like for sales only in a limited number of designated spots, which are allocated on a first-come, first-served basis (the "spot designations"). *Id.* § 1-05(b)(2)-(3). Additionally, the Revisions set forth general restrictions on the sale of expressive matter in non-designated areas of Central Park and all other City parks (the "general expressive matter vending restrictions"). *Id.* § 1-05(b)(4)-(8).

Before the Court is Defendants' motion for summary judgment, made pursuant to Federal Rule of Civil Procedure 56.[1] For the reasons that follow, Defendants' motion is granted in its entirety.

───────────────────

[1] Defendants also include Mayor Michael Bloomberg and Parks Commissioner Adrian Benepe, in their individual and official capacities, and the City of New York. Although the law is clear that the Department of Parks and Recreation is not a proper defendant, since a City agency is not a suable entity, *see* N.Y. City Charter ch. 17, § 396; *Bissinger v. City of N.Y.*, 06 CIV. 2325 (WHP), 2007 WL 2826756, at *5 (S.D.N.Y. Sept. 24, 2007), neither party has contested the issue, and the Court does not address it here.

## I. Background[2]

The New York City Department of Parks and Recreation (the "Parks Department") is charged with the management and care of all parks in the City, and is directed to maintain the beauty and utility of those parks. *See* New York City Charter ("Charter") § 533(a)(1); (Decl. of Jack T. Linn, dated Sept. 7, 2011, Doc. No. 40 ("Linn Decl."), ¶ 3). To fulfill this mandate, the Parks Department is authorized to promulgate rules and regulations for the use, management, and protection of public parks. Charter § 533(a)(9). These rules and regulations are set forth in 56 R.C.N.Y. § 1-01, *et seq.* (*See* Linn Decl. ¶ 3.)

Under the Parks Department's Rules, "vending" constitutes selling, offering for sale, hiring, leasing, letting, or providing or offering to provide services or items in exchange for a donation. 56 R.C.N.Y. § 1-05(b)(1). It is generally unlawful to vend on property under the Parks Department's jurisdiction, including the sidewalks that adjoin parkland, without a permit from the Parks Department. *Id.*; Charter § 533(a)(5). However, vendors of "expressive matter" – defined as "materials or objects with expressive content, such as newspapers, books or writings, or visual art such as paintings, prints, photography, or sculpture" – are not required to obtain permits to sell their wares on Parks Department property. 56 R.C.N.Y. §§ 1-02; 1-05(b)(2).

Likewise, no license is required to vend expressive matter on City streets and sidewalks that are not under the Parks Department's jurisdiction. *See* N.Y.C. Admin. Code ("Admin. Code") § 20-473; *Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996). However, expressive matter vendors on the City's streets and sidewalks must nonetheless comply with the General Vendor Laws relating to, *inter alia*, the size and placement of their vending tables as set forth in the City's Administrative Code. Admin. Code §§ 20-465(a)-(f), (k)-(q), 20-473. These restrictions do not address the parks specifically, and the Parks Department does not have authority to enforce them. (Linn Decl. ¶¶ 6-7.)

### A. Prior Attempts to Regulate Expressive Matter Vendors[3]

Though expressive matter vendors are exempt from the permit and license requirements applicable to vendors of other goods, the City has several times attempted to promulgate rules to regulate expressive matter vendors in certain respects. As a result of those efforts, the City and various expressive matter vendors have waged an ongoing battle with regard to the City's regulation of where and how those vendors may sell their wares.

---

[2] The facts are taken from the parties' briefs filed in connection with this motion ("Def. Br.", "Pl. Br.", and "Def. Reply Br."), the parties' Local Civil Rule 56.1 Statements ("Def. 56.1" and "Pl. Reply 56.1"), the parties' supplemental briefing ("Pl. Supp. Br." and "Def. Supp. Br."), the parties' post-briefing submissions to the Court ("Def. Ltr." and "Pl. Ltr."), the declarations submitted in connection with the instant motions, and the exhibits attached thereto. The facts are undisputed unless otherwise noted. Where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact.

[3] The Court set forth an overview of the City's previous attempts to regulate expressive matter vendors and the resulting litigation in more detail in its Memorandum and Order, dated July 16, 2010. *See Lederman v. N.Y.C. Dep't of Parks & Recreation*, Nos. 10 Civ. 4800 (RJS), 10 Civ. 5185 (RJS), 2010 WL 2813789, at *1-3 (S.D.N.Y. July 16, 2010) ("*Lederman III*"). The Court presumes the parties' familiarity with that Memorandum and Order.

For example, in 1996, in *Bery v. City of New York*, the Second Circuit addressed a licensing scheme that required all vendors other than book sellers to obtain a general vendor license before selling their wares in any public space. 97 F.3d 689, 692 (2d Cir. 1996). As part of the regulatory scheme, only 853 general vendor licenses were issued, and licenses became available only to new applicants when current license holders failed to renew. *Id.* As a result, at the time of the *Bery* decision, the waiting list to acquire a license had grown to between 500 and 5,000, and no new licenses had been issued in the previous fifteen years. *Id.* at 693, 697 n.7. The Second Circuit concluded that expressive matter vendors were entitled to "full First Amendment protection" and, on these facts, that the City's licensing scheme operated as "a *de facto* bar preventing visual artists from exhibiting and selling their art in public areas in New York." *Id.* at 696-97. Consequently, the Second Circuit concluded that the regulations were "too sweeping to pass constitutional muster." *Id.* at 697.

Taking to heart the *Bery* court's suggestion that "there exist less intrusive means" to accomplish the City's objectives, such as "a rotating first-come, first-served lottery system for assigning a limited number of licenses," *id.* at 698 n.8 (citation omitted), the City amended its regulatory scheme in 1998 to provide for "seventy-five site-specific permits for art vendors in Manhattan parks," *see Lederman v. Giuliani*, No. 98 Civ. 2024 (LMM), 1998 WL 186753, at *1 (S.D.N.Y. Apr. 17, 1998) ("*Lederman I*"). As part of that scheme, each permit gave "its holder a legal right to sell his work in a specific area for one month" at a cost of twenty-five dollars. *Id.* In the event that more than "seventy-five people appl[ied] for the seventy-five sites available in Manhattan, or if there [were] more applications than spaces available for any particular location, the Parks Department would hold a random-draw lottery for each month." *Id.* at *2. After declining to obtain permits, and consequently being ticketed, the plaintiffs in *Lederman I* brought suit and attempted to preliminarily enjoin further enforcement of the regulations on the grounds that the regulations violated the First and Fourteenth Amendments. *See id.* at *3-4.

The Honorable Lawrence M. McKenna, District Judge, denied the motions for a preliminary injunction, holding that the regulations were content-neutral time, place, and manner restrictions. *Id.* at *3, *6. Specifically, Judge McKenna concluded that, first, "[t]he City undoubtedly has a significant interest in preserving and promoting the scenic beauty of its parks, providing sufficient areas for recreational uses, and preventing congestion in park areas and on perimeter sidewalks." *Id.* at *3. Additionally, he found that the "regulations [were] narrowly tailored to serve the government's interest." *Id.* Finally, Judge McKenna held that the regulations left "open alternative avenues for communication," because "[a]n unlimited number of permits are available for Prospect Park in Brooklyn" and "[a]ny artist vendor who is foreclosed from obtaining a permit or chooses not to obtain one may, under *Bery*, sell his artwork on any other public sidewalk throughout the City not within the jurisdiction of the Parks Department, subject only to narrow restrictions." *Id.* at *3-4. After discovery, the parties filed motions for summary judgment. At that point, Judge McKenna concluded – without disturbing his preliminary analysis of the regulations' constitutionality – that, as a matter of state administrative law, the regulations should be interpreted not to apply to expressive matter

3

vendors. *See Lederman v. Giuliani*, No. 98 Civ. 2024 (LMM), 2001 WL 902591, at *6 (S.D.N.Y. Aug. 7, 2001) ("*Lederman II*"), *aff'd* 70 F. App'x 39, 40 (2d Cir. 2003).

### B. The Revisions

After Judge McKenna's decision, the City saw an increase in vendors in certain parks between 2001 and 2010. (*See* Linn Decl. ¶¶ 9-10; *id.* Ex. B; Decl. of Sheryl R. Neufeld, dated Sept. 7, 2011, Doc. No. 38 ("Neufeld Decl."), Ex. L at 11:15-20, 16:20-17:3; *id.* Ex. N at 31:18-21.) To address concerns about the proliferation of vendors in those parks, the Parks Department began to contemplate ways to regulate expressive matter vendors on its property. (Linn Decl. ¶ 6, n.3.) The Parks Department specifically targeted expressive matter vendors because vendors of non-expressive matter were already subject to numerous requirements set forth in the individual permits issued to them by the Parks Department. (Linn Decl. ¶ 12; Decl. of Julie Milner, dated Oct. 10, 2011, Doc. No. 61 ("Milner Decl."), Ex. F[4]); *see also* 56 R.C.N.Y. § 1-05(b)(1) ("No person in or on any property under the jurisdiction of the Department shall [vend] except under and within the terms of a permit, or except as otherwise provided by law.").

On March 24, 2010, the Parks Department published the proposed Revisions, and on April 23, 2010, held a public hearing at which over 100 members of the public expressed their opinion of the proposed rules. (Linn Decl. ¶¶ 11, 13, 22, Ex. A.) Based on the comments at the hearing, and over 200 written comments, the proposed rules were revised, and the revised rules were published in the City Record on June 18, 2010. (*Id.* ¶¶ 11, 13, Ex. A.) The revised rules became effective on July 19, 2010. (*Id.* ¶ 13.) Under the final version of the Revisions,

> [p]ersons may vend expressive matter . . . on property under jurisdiction of the [Parks] Department without a permit, but must comply with all applicable provisions of these rules. However, in the specific locations enumerated in paragraph (3)[,] expressive matter vendors may only vend expressive matter at the specifically designated spots identified by the Commissioner in the accompanying maps and as marked by a [Parks] Department decal, medallion, or other form of marking, on the specific location of the approved vending spot, unless they are only vending expressive matter without using a card, display stand or other device and without occupying a specific location for longer than necessary to conduct a transaction and are otherwise in compliance with [Parks] Department rules.
>
> These spots shall be allocated upon a first[-]come, first[-]serve[d] basis except as otherwise provided by law and any expressive matter vendor may only vend expressive matter centered directly behind the [Parks] Department decal, medallion, or other form of marking . . . .
>
> Expressive matter vendors can only occupy the designated spots for the purpose of vending expressive matter and only during posted times, which will be consistent with the hours of operation for the park where such

---

[4] The Court notes that the "Canned Art" presentation, attached to the Declaration of Julie Milner as part of Exhibit F, appears to be incomplete.

4

designated spots are located in or adjacent to.

56 R.C.N.Y. § 1-05(b)(2) (paragraph breaks added).

Section 1-05(b)(3) of the Revisions specifies the "spot designations" as follows:

[e]xpressive matter vendors may not vend in the following general areas unless they vend at the specifically designated spots for such vending on the accompanying maps and in compliance with all other applicable Department rules:

(i) Central Park at the following locations: (A) the perimeter of the park between East 85th Street and East 60th Street, including all sidewalks and plazas[,] (B) the perimeter of the park between West 86th Street and West 60th Street, including all sidewalks and plazas[,] (C) all of Central Park South, including all sidewalks and plazas[,] (D) Wien Walk and Wallach Walk, (E) pedestrian pathways parallel to East Drive between Grand Army Plaza and the Center Drive, (F) Grand Army Plaza, (G) Pulitzer Plaza, and (H) Columbus Circle.

(ii) Battery Park, including all perimeter sidewalks.

(iii) Union Square Park, including all perimeter sidewalks.

(iv) Elevated portions of High Line Park.

*Id.* § 1-05(b)(3) (paragraph breaks added).

The "accompanying maps" referenced in section 1-05(b)(3) set forth sixty-eight spots for expressive matter vendors in the designated portions of Central Park (including twenty-eight outside of the Metropolitan Museum of Art); nine spots for expressive matter vendors in Battery Park; eighteen spots for expressive matter vendors in Union Square Park – plus forty more on Tuesdays, Thursdays, and Sundays when the Greenmarket farmers' market is closed; and five spots along the High Line. (Linn Decl. ¶¶ 30, 36, 43, 46-49, Ex. H.) In selecting the spot designations, the Parks Department considered the number of visitors those parks received; monuments and art installations in those parks; the need to maintain access to park benches, gardens, and esplanades, as well as bus, subway, and ferry stops; the historical uses of the parks; the aesthetic integrity of those parks; and the unique features of those parks. (*See id.* ¶¶ 23-28; 30-43; 45; 47-49.) The Parks Department also considered where vendors have historically conducted business in making the spot designations, although Plaintiffs note that expressive matter vendors were not given an opportunity to choose the spot designations themselves. (*See id.* ¶ 21; Pl. Reply 56.1 ¶ 22.)

Outside these specific "spot designations," the Revisions allow expressive matter vendors to sell their wares anywhere in property under the Parks Department's jurisdiction, provided that they comply with the general expressive matter vending restrictions, which prohibit all vendors from, *inter alia*, blocking any person from using any street or park furniture, vending in a way that would damage or otherwise injure Department property, and vending anything over any ventilation grill, cellar door, manhole, transformer vault, or subway access grating. 56 R.C.N.Y. § 1-05(b)(4). The general expressive matter vending restrictions also prohibit vendors from, *inter alia*, using a

5

display stand that: provides less than a twelve-foot wide clear pedestrian path; is within five feet from any street or park furniture, disabled access ramp, or trees; is within ten feet from any crosswalk; or is placed within fifty feet from any monument or other public art installation. *Id.* § 1-05(b)(5)-(7). Finally, the Revisions require that, "[w]here exigent circumstances exist and a [Parks] Department employee or police officer gives notice to a vendor to move temporarily from any location[,] such vendor shall not vend from such location." *Id.* § 1-05(b)(8).

### C. The *Skyline* Decision

Despite seemingly contrary language in the Revisions, Defendants initially interpreted "expressive matter" broadly to include performances for donations by buskers and street artists.[5] (Linn Decl. ¶ 4, n.2.) Pursuant to that interpretation, Defendants stated, *inter alia*, that "the impact of [performance] artists on parkland is no different from the impact of artists who sell tangible items of art." (Decl. of Michael Dockett, dated Oct. 20, 2011, Doc. No. 36 ("Dockett Decl."), at ¶ 12.) Further, Defendants asserted that "the fact that both types of artists are subject to the designated spot requirement is evidence of the Parks Department's effort and intent to treat all expressive matter vendors equally." (Def. Reply Br. at 12.) Plaintiffs protested this interpretation, arguing that applying the Revisions to performers would deprive tangible art vendors of their already limited access to the designated spots. (Pl. Br. at 14-15.) Plaintiffs asserted that, because performance artists who expect to draw a crowd of twenty or more are already subject to permitting requirements, further requiring that performers use the medallions was an attempt by Defendants to drive visual artists out of City parks. (*Id.*)

However, on February 23, 2012 – after briefing in this matter had concluded – a New York State appellate court issued a decision calling Defendants' interpretation into question. *See In re New York Skyline, Inc. v. City of New York*, 939 N.Y.S.2d 42 (N.Y. App. Div. 2012). In *Skyline*, the New York State Supreme Court, Appellate Division, First Department read the definition of "vendor" in the City's Administrative Code – which resembles the definition of "vendor" in the Revisions – to exclude entertainers. *Id.* at 27. The First Department reasoned that, because the Code required vendors of "goods" and "services" to obtain permits, and because "[a]s a matter of common parlance, one would not say that [entertainment] is a 'service,'" entertainers need not obtain permits to sell their wares. *Id.*; *see also* Admin. Code §§ 20-452(b), 20-453 (defining a "vendor" as "a person who . . . sells . . . goods or services" and requiring a "vendor" to be licensed). Following the decision, in March 2012, the Parks Department announced that the Revisions would no longer be enforced against performers. (Def. Supp. Br. at 3; Def. Ltr., dated Sept. 24, 2012, Doc. No. 79 ("Def. Ltr."), at 2.)

### D. Procedural History

Plaintiffs filed the present action on June 18, 2010 – the same day that the Revisions were published. On June 24, 2010, the Court issued an Order denying Plaintiffs' application for an *ex parte* temporary restraining order. By Order dated July 16,

---

[5] As earlier noted, the Revisions define "expressive matter" as including "materials or objects with expressive content, such as newspapers, books or writings, or visual art such as paintings, prints, photography, or sculpture." 56 R.C.N.Y. §§ 1-02.

6

2010, the Court denied Plaintiffs' motion for a preliminary injunction.[6]

After the parties engaged in extensive discovery, including depositions of multiple high-ranking Parks Department officials, interrogatories, and the production of numerous documents, Defendants filed the instant motion on September 9, 2011. (Doc. No. 34.) The motion was fully submitted as of October 20, 2011. However, on May 14, 2012, Plaintiffs requested permission to supplement the record with evidence of Defendants' changed enforcement policy as to performers following the *Skyline* decision (Doc. No. 71); that same day, the Court granted Plaintiffs' request and permitted Defendants to file a response (*id.*). In their response, Defendants asserted that the changed enforcement policy was temporary pending the City's appeal of the *Skyline* decision. The Court heard oral argument on the motion on July 20, 2012.

On August 30, 2012, the New York State Court of Appeals denied the City's motion for leave to appeal the *Skyline* decision, *In re New York Skyline, Inc. v. City of New York*, No. 2012-642, 2012 WL 3743746, at *1 (N.Y. Aug. 30, 2012), and on September 20, 2012, the Court directed the parties to make submissions concerning the impact, if any, of that ruling on the instant motion (Doc. No. 78). Complying with that order, Defendants responded that the current Revisions would not be enforced against performers but declared their intent to amend the Revisions so that they would again apply to and be equally enforced against performers and vendors of tangible art. (Def. Ltr., dated Sept. 24, 2012, Doc. No. 79 ("Def. Ltr."), at 2.) Abandoning their earlier position, Plaintiffs replied that the *Skyline* decision is a "mere post-hoc justification" for Defendants' long-standing practice of targeting visual artists for enforcement, and that the Revisions should be ruled unenforceable in their present state, regardless of Defendants' intent to revise them, because of their unequal impact on similarly situated artists. (Pl. Ltr., dated Sept. 26, 2012, Doc. No. 81 ("Pl. Ltr."), at 2-3.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), a court may not grant a motion for summary judgment unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that it is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted); *accord Anderson*, 477 U.S. at 248. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [non-moving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted).

---

[6] On July 7, 2010, *Dua v. New York City Department of Parks and Recreation*, 10 Civ. 5185, was referred to this Court as related to the present matter. Plaintiffs in that case voluntarily dismissed the suit on July 12, 2011. *See Dua v. N.Y.C. Dep't of Parks & Recreation*, 10 Civ. 5185 (RJS), Doc. No. 37. The case was closed on July 12, 2011.

III. DISCUSSION

Plaintiffs challenge the Revisions, which regulate the time, place, and manner of the sale of expressive matter, under the First Amendment. (*See* Pl. Br. at 2-23.) Plaintiffs also challenge the Revisions under the Fourteenth Amendment, asserting that they impinge on their fundamental First Amendment rights and are enforced selectively against art vendors, as opposed to corporate vendors or performers. (*See* Pl. Br. at 23-29.) Finally, Plaintiffs allege several violations of their civil rights, under 42 U.S.C. § 1985 and § 1986, as well as retaliation for exercising their free speech rights. For the reasons set forth below, the Court finds that Defendants are entitled to summary judgment on each of Plaintiffs' claims.

A. First Amendment Claims

Though the expressive matter sold by Plaintiffs is afforded full First Amendment protection, *see Bery*, 97 F.3d at 695-96, the City may, within constitutional limits, regulate the time, place, and manner of activities in public parks, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Housing Works, Inc. v. Kerik*, 283 F.3d 471, 478 (2d Cir. 2002). To determine if a time, place, and manner regulation passes constitutional muster, it is first necessary to decide if the regulation is content neutral. Courts apply intermediate scrutiny to content-neutral time, place, and manner regulations, upholding reasonable restrictions that are narrowly tailored to meet a significant government interest and leave open ample alternative means of communication. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006). Conversely, content-based regulations are subject to strict scrutiny and are presumptively invalid. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

1. Content Neutrality

As the Court held in its Memorandum and Order denying Plaintiffs' motion for a preliminary injunction, the Revisions, as drafted, are unquestionably content-neutral. *See Lederman v. N.Y.C. Dep't of Parks & Recreation*, No. 10 Civ. 4800 (RJS), 2010 WL 2813789, at *8 (S.D.N.Y. July 16, 2010) ("*Lederman III*"). Nevertheless, Plaintiffs continue to press the argument, first advanced in their motion for a preliminary injunction, that the Revisions are content-based because they treat expressive matter vendors differently from other vendors, such as commercial and corporate ones. (Pl. Br. at 10-15.) The fact that the Revisions target expressive matter vendors is undisputed. However, Plaintiffs are simply mistaken in their assertion that "all regulations distinguishing between speakers warrant strict scrutiny." *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 657 (1994). In fact, "heightened scrutiny is unwarranted when the differential treatment [between speakers] is justified by some special characteristic of the particular [speaker] being regulated." *Id.* at 660-61. Expressive matter vendors clearly have such a "special characteristic" – specifically, the fact that they are not covered by the regulations that govern *other* vendors. Thus, strict scrutiny is not warranted merely because the Revisions "target [expressive matter vendors] and no other type of vendor or parkgoer." (Pl. Br. at 8.)

As the Supreme Court has explained:

> [t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or

manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Ward*, 491 U.S. at 791, *accord Hous. Works, Inc. v. Kerik*, 283 F.3d 471, 480 (2d Cir. 2002). In this case, the Revisions are completely unrelated to the content of the expressive matter being sold. Plaintiffs have put forth no evidence to indicate that the Revisions as drafted treat types of expressive matter differently based on the ideas or messages that they convey. Further, Plaintiffs have not demonstrated that the spot designations are distributed according to the content of the expressive matter sold. Put simply, the Revisions apply to *all* expressive matter, regardless of the content of the item sold.

Further, the Revisions as enforced are content-neutral. In their supplemental briefing, Plaintiffs assert that Defendants' decision to exempt performers from the Revisions "is an impermissible restriction based on content." (Pl. Supp. Br. at 5.) Putting aside Plaintiffs' earlier position that *including* performers under the Revisions was evidence of content-based animus, Plaintiffs again offers a mistaken view of content neutrality. First, there are any number of "special characteristic[s]" distinguishing vendors of tangible art and performing artists that support the present policy, not least among them that, as Plaintiffs acknowledge, performers are already subject to permitting requirements when they expect to draw large crowds.

Second, Defendants' purpose in adopting the new policy was to comply with an unanticipated (and arguably ill-reasoned[7]) court ruling – a matter plainly divorced from the content of tangible art vendors' speech. Finally, the City's present enforcement policy is a sharp departure from the licensing regime struck down in *Bery*, where visual art vendors were effectively banned while book vendors operated largely unfettered. *See Bery*, 97 F.3d at 696. There, the court suggested that the regulation might be content-based due to the risk that the "effective bar on the sale of [visual] artwork in public places raises concerns that an entire medium of expression is being lost." *Id.* The same simply cannot be said of the Revisions, given their relatively limited impact on tangible art vendors in only four City parks. Because the Revisions do not thus "raise[] suspicions that [Defendants'] objective was, in fact, the suppression of certain ideas," *Turner*, 512 U.S. at 660, the Revisions are content neutral as enforced.

Nor do the Revisions reflect government disapproval of the protected activity of *selling* expressive matter. *See Lederman III*, 2010 WL 2813789, at *6-7. As an initial matter, the Revisions are part of a larger regulatory scheme that governs the time, place, and manner of *all* vendors' sales. *See* 56 R.C.N.Y. § 1-05(b)(3); (Linn Decl. Ex. F). Although the Revisions apply only to expressive matter vendors, once again, this is simply because courts have struck down previous attempts to treat expressive matter vendors like all other vendors. *See Bery*, 97 F.3d at 698-99. Indeed, expressive matter

---

[7] Indeed, Judge Buchwald reached the contrary conclusion in her analysis of the Revisions' definition of "vendor." Specifically, Judge Buchwald held that vending encompasses face painting and the making of balloon animals when done for donations. *See Alhovsky v. N.Y.C. Dep't of Parks & Recreation*, No. 11 Civ. 3669 (NRB), 2012 WL 3552916 (S.D.N.Y. Aug. 16, 2012), at *3-4.

vendors are treated *more favorably* than other vendors – they can sell their wares without a general vendor license, they can sell in any public space in the City subject only to the General Vendor Laws, and they can sell in any space under the Parks Department jurisdiction subject only to the limited general expressive matter vending restrictions set forth in section 1-05(b)(3).[8]

Plaintiffs' argument that the Revisions – specifically, the spot designations – "were designed to be a clandestine licensing scheme a[nd] an end run around this Court's jurisprudence" (Pl. Br. at 8) is not only unsupported by the record but also fails as a matter of law. In support of this apparent argument that the Revisions delegate too broad discretion to authorities, Plaintiffs offer nothing more than the "evidence" that Parks officials are charged with overseeing the distribution of the spot designations each morning, and that Parks officials are vested with the authority to enforce the Revisions and issue summonses for those vendors who are not in compliance. (*Id.* at 10.) Even if these facts were not obviously insufficient as a matter of law, they have nothing to do with the *content* of the expressive matter being sold as opposed to the *category* of vendor selling them. *See Mastrovincenzo*, 435 F.3d at 99 ("Unlike a licensing scheme in which 'there are no limiting criteria or standards' for when a license will be required, New York City's licensing requirement applies across the board to all non-exempt vendors." (citation omitted)).

Accordingly, as content-neutral regulations, the Revisions will pass constitutional muster if they are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication." *See Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)) (internal quotation marks omitted).

2. Significant Government Interests

Defendants assert that the Revisions were promulgated in order to promote the City's interests in

> alleviating congestion and improving circulation, promoting aesthetics by preserving the integrity of the overall design of the parks, including the need to preserve landscapes and scenic views, and ensuring that the parks are available to the public for a wide range of activities, including active and passive recreation, performances, demonstrations and the viewing of historical monuments and public art exhibits.

(Def. Br. at 8-9; *see also* Linn Decl. Ex. A at 4 (the Revisions "address concerns . . . related to the proliferation, in certain parks, of expressive matter vendors and the impact they can have on parkland and other park visitors. . . . [T]o accommodate the interest of a broad range of park visitors, including the interests of expressive matter vendors who wish to operate on parkland, the rules establish general park locations where vendors may operate and minimum requirements regarding vending activity.").) Without question, these interests are

---

[8] The Court notes that, at oral argument, Plaintiffs seemed to suggest that vendors who are subject to the permit scheme in the General Vendor Laws are somehow "better off" than Plaintiffs. (*See* Tr. 21:5-22:17.) However, there is nothing in the record to suggest that the General Vendor Laws, applicable to commercial vendors, are less restrictive than the Revisions. Further, nothing in the record indicates that Plaintiffs are prohibited from seeking a general vendor permit. Finally, it must be reiterated that the Revisions are, in large part, a response to Plaintiff Robert Lederman's prior course of litigation that endeavored to exempt visual art vendors from the General Vendor Laws.

significant. *See Ward*, 491 U.S. at 797 ("The city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer . . . ."); *Clark*, 468 U.S. at 296 ("[The g]overnment[ has a] substantial interest in maintaining the parks . . . in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence."); *Bery*, 97 F.3d at 697 ("The City certainly has a significant interest in keeping its public spaces safe and free of congestion."); *Lederman I*, 1998 WL 186753, at *3 ("The City undoubtedly has a significant interest in preserving and promoting the scenic beauty of its parks, providing sufficient areas for recreational uses, and preventing congestion in park areas and on perimeter sidewalks.").

Indeed, Plaintiffs do not dispute that these stated purposes implicate government interests. Rather, Plaintiffs argue that Defendants' stated interests are pretextual, and that Defendants actually promulgated the Revisions to drive visual artists out of the parks or to retaliate against Plaintiffs personally. (Pl. Br. at 10-20, 32-34.) Once again, however, Plaintiffs' arguments that the Revisions were promulgated because of an animus against artists finds no support in the record. Plaintiffs argue that vendors of all sorts increased in the City's parks between 2001 and 2010, and the Revisions therefore betray the City's animus against artists because the Revisions target expressive matter vendors. (Pl. Reply 56.1 ¶¶ 14, 16.) As discussed above, however, the Revisions target expressive matter vendors specifically because those vendors were not subject to the regulatory schemes that govern other vendors.

Plaintiffs also note that, leading up to the promulgation of the Revisions, the Parks Department discussed only art and artists in relation to defining "expressive matter vendors." (Pl. Br. at 12.) However, the record indicates that the Parks Department tracked primarily artists as a means of gauging the increase in expressive matter vending and that the Revisions were spurred, in part, by the dramatic increase in art vendors. (Linn Decl. ¶¶ 9, 10; *id.* at Ex. B; *see* Pl. Reply 56.1 ¶ 14; Milner Decl. at Ex. F.) That the Parks Department used "artists" as shorthand for "expressive matter vendors" does not betray animus against artists. Nor is there any indication that the Parks Department's proffered reasons for promulgating the Revisions were a pretext for driving artists out of the parks.

Plaintiffs advance several other theories to support their argument that the Parks Department's reasons for promulgating the Revisions were pretextual. (Pl. Br. at 15-20.) These theories also fail. For example, Plaintiffs insist that Defendants' proffered reasons must be pretextual because the City has an interest in reducing pedestrian congestion only when there is a nexus between a threat to public safety and the congestion the municipality seeks to limit. (Pl. Br. at 16.) However, the law in the Second Circuit defines the City's interest in alleviating congestion much more broadly. *See Mastrovincenzo*, 435 F.3d at 100 ("There can be no doubt that New York City's avowed objectives in enforcing its licensing requirement, such as reducing sidewalk and street congestion in a city with eight million inhabitants, constitute 'significant government interests.'"); *Bery*, 97 F.3d at 697.

Additionally, Plaintiffs argue that Defendants have not offered any evidence to show that the expressive matter vendors caused any dangerous congestion or that they were the sole cause of congestion. (Pl. Reply 56.1 ¶ 15.) In this vein, Plaintiffs

11

insist that other activities – such as the Union Square Greenmarket and the Holiday Markets at Columbus Circle and Union Square – contribute more significantly to congestion and pose greater threats to public safety than expressive matter vendors. (Pl. Br. at 16-17.) However, as the Court noted in its July 16, 2010 Memorandum and Order, "[t]hat the City tolerates heightened congestion in some circumstances neither requires it to tolerate such congestion at all times nor suggests that its other congestion-reducing measures are pretextual." *Lederman III*, 2010 WL 2813789, at *9. Furthermore, the Revisions were promulgated not only to reduce congestion, but also to address aesthetic concerns, to prevent interference with other users' enjoyment of the parks, and to allow for an array of activities to take place in the parks. (*See* Def. 56.1 ¶ 19; Linn Decl. ¶ 7; Ex. A at 4.)

Finally, as discussed, while Plaintiffs initially argued that the inclusion of performance artists under the Revisions was an attempt to drive visual artists out of parks (Pl. Br. at 14-15), they now contend that Defendants' effort to comply with the *Skyline* decision is a mere ruse to conceal the City's intent to discriminate against visual artists (Pl. Ltr. at 2) – not to serve the aforementioned government interests. However, there is simply no evidence in the record to support this contention.

Because Defendants have shown that the Revisions serve several significant government interests, and because Plaintiffs have done nothing more than allege pretext (without factual basis), the Court last looks to whether the Revisions are narrowly tailored and allow for ample other means of communication.

### 3. Narrowly Tailored

To be "narrowly tailored," a regulation need not be "the least restrictive or least intrusive means" of achieving the City's interest in preserving its parkland and regulating its use. *See Ward*, 481 U.S. at 798. Rather, "the narrow tailoring requirement is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)) (internal quotation marks omitted). As long as the regulations as a whole are "not substantially broader than necessary to achieve the government's interest[,] . . . the regulation[s] will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

The record reflects that Defendants attempted only to impose spot designations on the most heavily used areas. For instance, the Linn Declaration sets forth the specific considerations made in choosing the designated vending spots, including the volume of park visitors, the specific aesthetic needs of the parks, transportation within the parks and access to the parks, the historic uses of the parks, and the configuration and layouts of the parks. (*See* Linn Decl. ¶¶ 7, 16-17, 20-21.) Additionally, in deciding where to place the spot designations, the Parks Department considered where expressive matter vendors traditionally vended and attempted to accommodate them even where the general expressive matter vending restrictions would otherwise preclude vendors from setting up. (*Id.* at ¶ 21.) The record likewise reflects that the Parks Department considered comments received during the public review process, and moved and added spots in

response to those comments. *See Lederman III*, 2010 WL 2813789, at *10 (noting that "the Revisions bear the hallmarks of a carefully considered attempt to advance a significant government interest without placing undue burdens on expressive-matter vendors").

Moreover, the Revisions essentially track suggestions set forth in previous cases. For instance, the *Bery* Court suggested a "less intrusive means" for accomplishing the goals of the regulations it struck down, including a "first-come, first-served lottery system for assigning a limited number of licenses." 97 F.3d at 698 n.8. That recommendation echoed the admonition of numerous other courts to limit licensing discretion in government officials. *See, e.g.*, *Ward*, 491 U.S. at 791; *Hous. Works, Inc.*, 283 F.3d at 478. Consequently, the Revisions require that medallions be allocated on a first-come, first-served basis, and articulate rules and standards that specifically withhold discretion from government officials. *See* 56 R.C.N.Y. § 1-05(b)(2)-(3). That there may be a different – or better – way to regulate expressive matter vendors is not dispositive as long as the regulations as a whole are "not substantially broader than necessary to achieve the government's interest[.]" *Ward*, 481 U.S. at 798.

Finally, while Defendants' decision to exclude performers from enforcement may diminish the effectiveness of the Revisions, there is no evidence in the record to suggest that such an outcome is inevitable, nor is it the Court's place to dictate the minute details of City policy. As the Supreme Court instructed in *Ward*, the "validity of [time, place, and manner] regulations does not turn on a judge's agreement with the responsible decision maker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." 481 U.S. at 798 (quoting *Albertini*, 472 U.S. at 689) (internal quotation marks omitted). Though the *Bery* court did fault the prior licensing regime on such underinclusiveness grounds, that finding is inapposite here: the book vendors in *Bery* were virtually unregulated and the art vendors virtually banned; the performers here remain subject to all Parks Department regulations outside the Revisions and tangible art vendors enjoy equal freedom outside the four parks with the spot designations. *See Bery*, 97 F.3d at 698.

Thus, the Court finds that the Revisions are narrowly tailored to serve the cited government interests.

### d. Ample Alternative Channels

Neither the federal nor state constitution guarantees a person the right to "communicate one's views at all times and places and in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). Although ample alternatives must be available, speakers are not guaranteed "access to every or even the best channels or locations for their expression." *Carew-Reid v. MTA*, 903 F.2d 914, 919 (2d Cir. 1990) (citing *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984)). Moreover, the "requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand." *Mastrovincenzo*, 435 F.3d at 101.

The Court finds that, under the Revisions as drafted and as enforced, expressive matter vendors have ample avenues to sell their wares. In Central Park alone, vendors may

13

sell artwork in any part of the perimeter of Central Park north of 86th Street, and in any part of the interior of Central Park other than the pathways along the Central Drive and Wein and Wallach Walks. (Linn Decl. ¶ 29.) Expressive matter vendors may also sell their wares at any other park in the City, provided that they comply with the provisions of the general expressive matter vending restrictions. (*Id.* at ¶ 14.) Although vending is not permitted everywhere – such as on grassy areas, in close proximity to park benches, or on pathways that provide less than a twelve-foot wide clear pedestrian path – a significant amount of the Parks Department's 2,700 acres of parkland in Manhattan is available to expressive matter vendors. (*Id.* at ¶¶ 50-51; Dep. of Douglas Blonsky, dated June 22, 2011, Doc. No. 38 ("Blonsky Dep. Tr."), at 22:3-24:4.)

Plaintiffs rejoin that this account of available space is a "linguistic trick" by the Parks Department meant to obscure the fact that "there is . . . little parkland left under the Revision[s] legally available for artists." (Pl. 56.1 Reply ¶ 42.) Plaintiffs claim that "only a miniscule amount" of pathways in Central Park have a fifteen-foot or more clearance, and that when questioned, certain Defendants could not identify which sections of those pathways would be available to vendors.[9] Plaintiffs argue that "[a] reasonable jury could infer from these facts that [D]efendants have utterly failed to articulate a single, *bona fide* legal spot in any of the four affected parks outside the medallions because Jack Linn and the other mysterious drafters cleverly and surreptitiously designed the new rules to foreclose vending entirely within the interior of these parks." (Pl. Br. at 22.) Plaintiffs base this argument on Commissioner Adrian Benepe's alleged "inability" to identify legal vending spots under the general expressive matter vending restrictions in Central Park when Plaintiffs presented him with a tourist map at his deposition. (*See* Pl. Br. at 21-22; Tr. of Oral Argument, dated July 20, 2012 ("Tr."), at 4:16-22.)

However, this argument is a slender reed in light of the record as a whole. That Benepe did not identify areas permissible for expressive matter vendors under the general restrictions does not indicate that there is not "a single, *bona fide* legal spot in any of the four affected parks outside the medallions," as Plaintiff contends. (*See* Pl. Br. at 22.) Indeed, the map presented to Benepe solely concerned Central Park; there is no support for the contention that the Revisions unduly limit vending in any of the hundreds of other parks in the City. Nor do Plaintiffs contend that areas identified by Defendants as potentially appropriate for expressive matter vending – such as the Central Park Mall and the path leading toward Wollman Rink – fall afoul of the Revisions. (*See* Dep. of Jack Linn, dated June 23, 2011, Doc. No. 44, at 25:6-21; Blonsky Dep. Tr. at 24:2-4.) Furthermore, expressive matter vendors can vend on public sidewalks throughout the City, and the Revisions do not prohibit expressive matter vendors from giving their goods away or from vending while not stationary. (Linn Decl. ¶ 12.)

Finally, Plaintiffs argue that the spots available to expressive matter vendors are not adequate because they are not suitable for vending activity or are poorly located. (Tr. at 26:25-27:5.) However, as noted

---

[9] Plaintiffs assert that the Revisions extend the required clearance to fifteen feet – three more than under the general vending restrictions. (Pl. Reply 56.1 ¶ 42.) However, as stated in the Revisions, expressive matter vendors may not erect a display table within "less than a twelve[-](12)[-]foot[-]wide clear pedestrian path measured from the display on the sidewalk or park path to the opposite edge of the sidewalk or park path." 56 R.C.N.Y. § 1-05(b)(5)(i). Thus, there is no support for Plaintiffs' contention.

above, the law does not require "access to every or even the best channels or locations for their expression." *Carew-Reid*, 903 F.2d at 919. Moreover, if the spot designations are unsatisfactory, expressive matter vendors can choose to sell their wares elsewhere (subject to the general expressive matter vending restrictions), carry their wares instead of vending while stationary, or obtain a general vendor permit.

While Plaintiffs may prefer to vend throughout the more lucrative park areas, the very qualities that make these locations attractive to Plaintiffs – presumably, high foot traffic – support the City's efforts to regulate their use. Accordingly, because the Revisions are content-neutral, and narrowly tailored to serve a substantial government interest while permitting ample other avenues for communication, the Court finds that Defendants are entitled to summary judgment on Plaintiff's First Amendment claims.

### B.  Equal Protection Claims

Plaintiffs also challenge the Revisions under the Fourteenth Amendment, alleging that the regulations intrude on their fundamental First Amendment rights and discriminate against them as visual art vendors while sparing similarly situated vendors. (*See* Pl. Br. at 23-29.) However, for the reasons discussed above, both of these claims fail.

The equal protection clauses of the federal and state constitutions "guarantee[] every person the equal protection of the laws, 'which is essentially a direction that all persons similarly situated should be treated alike." *Jankowski-Burczyk v. INS*, 291 F.3d 172, 176 (2d Cir. 2002). "Legislative acts [and regulatory schemes] that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality and must be upheld if 'rationally related to a legitimate state interest.'" *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).

Expressive matter vendors are not a suspect classification, and Plaintiffs do not suggest as much. Instead, Plaintiffs' argument for strict scrutiny rests on the contention that the Revisions impinge on Plaintiffs' fundamental, First Amendment rights. (Pl. Br. at 23-28.) However, as discussed above, the Court finds that the Revisions fall well within the parameters of the First Amendment. Accordingly, the Revisions are subject only to rational basis review for equal protection purposes. Under rational basis review, Plaintiffs' Equal Protection claims must fail as a matter of law, because Defendants have met the low bar in establishing that the Revisions are "rationally related to a legitimate government interest," namely, promoting the use and enjoyment of public parks. *See Kraham v. Lippman*, 478 F.3d 502, 506 (2d Cir. 2007); *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 55 (1986) (finding that respondents fared "no better under the Equal Protection Clause than under the First Amendment itself" when a sufficient rationale existed for the ordinance under the First Amendment).

Furthermore, Plaintiffs' contention of discrimination is wholly unjustified. Prior to the *Skyline* decision, Plaintiffs' sole support for this allegation were conclusory assertions that corporate vendors are exempt from the Revisions and that "favored artists" such as Sol Lewitt and Christo and Jean-Claude were permitted to install work in the parks while Plaintiffs are limited in their ability to do so. (Pl. Br. at 26-28.)

15

However, as discussed earlier, there are plainly legitimate reasons for these distinctions, not least among them that the so-called "favored artists" were merely displaying their works as opposed to vending and that corporate vendors are subject to other, stricter regulations not imposed on expressive matter vendors. Plaintiffs' claims of unequal treatment have somewhat more force in light of Defendants' changed policy with respect to performers, but on close inspection, these claims too must fail. As an initial matter, it is well-established that courts are sharply limited in their ability to question governmental line-drawing under rational basis review. *See, e.g.*, *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 486 (1955). That there is no apparent invidious discrimination or animus alone warrants upholding the Revisions. However, the record itself provides significant support for the finding the Plaintiffs' claims are unfounded. First, it is not at all apparent to the Court that tangible art vendors and performing artists *are* similarly situated – indeed, Plaintiffs themselves argued for the exclusion of performers on these grounds prior to the *Skyline* decision. Moreover, there is significant evidence in the record that the influx of tangible art vendors – and tangible art vendors alone – was the driving impetus for the Revisions in the first place. (Linn Decl. ¶¶ 9, 10; *id.* at Ex. B; Neufeld Decl., Ex. L at 11:9-14, 16:8-17:17). Finally, Defendants have, at a minimum, articulated one very rational basis for any alleged disparate treatment – namely, the desire to comply with a judicial ruling in *Skyline*. (*See* Tr. at 6:14-8:8.)

Consequently, Defendants' motion for summary judgment on Plaintiffs' Fourteenth Amendment claim is granted.

### C. Plaintiffs' Other Claims

Plaintiffs also raise claims for conspiracy under 42 U.S.C. § 1985 and § 1986, and a claim for retaliation. Because Plaintiffs' First and Fourteenth Amendment claims have failed, their conspiracy and retaliation claims must fail as well.

Section 1985 allows an injured party to seek damages if "two or more persons in any State conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985. To state a conspiracy claim in violation of § 1985, a plaintiff must allege (1) a conspiracy, (2) for the purpose of depriving any person or class of persons of the equal protection of laws, (3) an act in furtherance of the conspiracy, (4) whereby a person is deprived of any right or privilege of a citizen of the United States. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971). As Plaintiffs cannot demonstrate that the Revisions impinge upon their First or Fourteenth Amendment rights, their conspiracy claim must also fail.

Plaintiffs seek to hold Mayor Michael Bloomberg liable under 42 U.S.C. § 1986,[10] which states that any person "who, having knowledge that any of the wrongs conspired to be done, and mentioned in § 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do" is liable to the injured party for

---

[10] Plaintiffs identified this claim as arising under 42 U.S.C. § 1985. (*See* Compl. ¶¶ 50-53.) However, because Plaintiffs allege that Mayor Bloomberg failed to prevent a § 1985 violation, it is clearly a claim under § 1986.

such a wrongful act "if such wrongful act be committed." However, without a violation of § 1985, there can be no violation of § 1986. See 42 U.S.C. § 1986; *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 292 (2d Cir. 1992). Thus, Plaintiffs' § 1986 claim fails.

Finally, to make out a First Amendment retaliation claim, a plaintiff must show "(1) an interest protected by the First Amendment; (2) [that] defendants' actions were motivated or substantially caused by his exercise of that right; and (3) [that] defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). Because the Revisions are valid time, place, and manner restrictions that leave Plaintiffs ample alternative channels for vending, Plaintiffs cannot fulfill the third element of the claim.[11] Accordingly, Plaintiffs' retaliation claim fails as well, and Defendants' motion for summary judgment on these claims is granted.

## IV. Conclusion

Plaintiffs have made a practice of contesting any attempt to limit their ability to display and sell their art whenever and however they please. However, the Constitution recognizes that the City must be permitted to balance Plaintiffs' speech rights with other myriad demands on municipal resources. It is thus beyond debate that the City "enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer." *Ward*, 491 U.S. at 797 (1989). Because the City has established that unbounded vending would squelch a range of those benefits, and has responded with narrow, targeted regulations that leave Plaintiffs ample opportunity to exercise their rights, Defendants' motion for summary judgment is granted. The Clerk of the Court is respectfully requested to terminate the motion located at Doc. No. 34 and to close this case.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 30, 2012
New York, New York

\*\*\*

Plaintiffs Robert Lederman and Jack Nesbitt are represented by Julie Marie Milner of Milner Law Office, PLLC, 8302 Broadway, Third Floor, Elmhurst, New York 11373.

Defendants are represented by Michael A. Cardozo, Corporation Counsel of the City of New York, as well as Mark W. Muschenheim, Teresita Villaseca Magsino, and Sheryl R. Neufeld, of Counsel, 100 Church Street, New York, NY 10007.

---

[11] Plaintiffs' appear to bring a claim against the City, pursuant to *Monell v. Dep't of Soc. Servs. of City of N.Y.*, that mirrors their retaliation claim. See 436 U.S. 658 (1978); (Compl. ¶¶ 57-62). Naturally, this claim fails for the same reason that the individual retaliation claim fails.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/30/2012